STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

24-386

DEVAN SIMPSON

VERSUS

JOSHUA JAGNEAUX

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 20191602
HONORABLE SUSAN L. THEALL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**ELIZABETH A. PICKETT**
**CHIEF JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Shannon J. Gremillion, and Van H. Kyzar, Judges.

**AFFIRMED.**

Katherine L. Hurst
Attorney at Law
600 Jefferson Street, Suite 555
Lafayette, LA 70501
(337) 233-6930
COUNSEL FOR DEFENDANT-APPELLANT:
    Joshua Cole Jagneaux

**Richard D. Mere**
**Richard D. Mere, LTD**
**Attorney at Law**
**701 Johnston Street**
**Lafayette, LA 70501**
**(337) 269-5555**
**COUNSEL FOR PLAINTIFF-APPELLEE:**
     **Devan Simpson**

**PICKETT, Judge.**

The plaintiff appeals the trial court's judgment awarding him and the defendant joint custody, naming the defendant domiciliary parent, and awarding the plaintiff custody overnight every Thursday and alternating weekends from Thursday to Monday. We affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

Joshua Cole Jagneaux (hereinafter referred to as "Cole") and Devan Simpson are the parents of three children, Landon, Camille, and Owen. Cole and Devan never married and co-parented their children for a number of years. Since 2019, the parties have been in and out of court for various custody-related issues.oon September 15, 2021, the parties entered into a stipulated judgment which granted them joint custody of the three children with no designation of a domiciliary parent and set forth a joint custody plan that provided for 3-1-3 custodial periods for the two younger children. Custody of the oldest child Landon was to be determined by a reconciliation counselor because he would not visit his father. On April 6, 2022, Cole filed a Rule to Modify Custody to Change Domiciliary Status to the Father and to Reduce the Mother's Periods of Physical Custody, to Place Certain Restrictions on the Periods of Physical Custody of Devan Simpson and to Eliminate, or Alternatively, Reduce Child

Support, and for Contempt. In September 2022, Devan filed Petition for a Protective Order alleging Cole abused her. After an October12, 2022, the trial court denied Devan's request.

Cole's April 6, 2022 Rule was tried from July 31 through August 3, 2023. The parties, Landon, Cole's wife, Katherine Jagneaux; Cole's father, Jody Jagneaux; Cole's stepmother, Kathy Jagneaux; Devan's father, Jon Simpson; and four experts testified at trial, i.e., Dr. Rhea Cooper, who has a PhD. in counseling and supervision, testified as an expert in child therapy; Walter Camos, a licensed professional counselor, testified as an expert in counseling therapy; Connie Leblanc, a licensed professional counselor and licensed marriage and family therapist, testified as a parenting coordinator; and Carla Boudreaux, a counselor, worked with Landon to improve his relationship with Cole.

Cole testified he and Landon had not had a relationship in over two years and that the last time Landon was at his home was in December 2021, when he brought all three children to visit his maternal grandmother for Christmas. He attempted to connect with Landon without success. They began seeing a therapist to improve their relationship, which was initially promising. He and Landon went to basketball games and had dinner together a few times. Cole explained, however, Landon stopped answering his calls as 2022 progressed. Due to personal reasons, the therapist could no longer see him and Landon. At trial, Cole testified he was seeing a new counselor, but he had not had a joint session with Landon yet. He explained he tried to schedule visits with Landon numerous times without success and had contacted Landon, but Landon would not respond to his text messages.

Cole testified he wants to restore his relationship with Landon and has followed all recommendations and suggestions made by the professionals he has seen. He believes Devan and her father interfere with his attempts to have a relationship with

Landon. He also feels Jon is the "primary driver" of his and Landon's problems and believes he tells Landon not to visit him or have a relationship with him.

Cole described his relationship with Camille and Owen as great. He has taken care of their medical needs, scheduling and bringing them to their appointments, and he is in charge of their educational needs pursuant to the last judgment. He explained he moved Camille from Woodvale Elementary School to Fatima Catholic School for the 2023-2024 school year because she was being bullied. He pays 100% of Camille's tuition at Fatima.

Cole's relationship with Jody and Kathy is not good. Similar to his relationship with Landon, Cole has not seen his father in more than two years. The evidence shows the separation is the result of his refusal to allow them to visit the children unless he is present. Devan often includes Jody and Kathy in the children's activities at her house and with her family. Jody and Kathy do not feel Cole should control when and where they see the children. Cole testified Kathy has great animosity toward him. He feels Kathy betrayed him after he shared confidential information with her then she used it against him.

According to Cole, Devan agreed when counseling with Ms. LeBlanc to have his parents visit the children through him, not her, because he wanted to visit his parents and the children together. He asserted Devan reneged on the agreement. Ms. LeBlanc did not address this in her testimony.

Cole is concerned about Landon's attendance at school and his grades. He testified Devan moved Landon from one school to another without his knowledge after stipulating she would leave him where he was prior to the stipulated judgment being signed. He also complained Devan did not keep him posted on his grades and absences from school, which included a suspension for vaping at school. Devan moved Landon back to the first school the following school year.

Cole is greatly upset by Devan's relationship with Joshua Romero, who has a criminal history, and Devan's failure to take his concerns seriously. He testified that she left Camille and that Owen alone with Joshua and Joshua spanked Camille with a belt. He also understood Devan dressed Camille in front of Joshua and Joshua urinated in the yard and encouraged Owen to do the same. He wanted Devan to keep the children away from Joshua, but she would not assure him she would.

On cross-examination, Cole admitted he lied to Katherine when he told her he had a college degree in engineering when he did not. Cole testified he was part-owner of a business with Jon until Jon sold the business. Jon disputed this testimony and testified Cole worked for him at one time.

Katherine testified she and Cole have been married two years. She testified Cole has degree in civil engineering. She also testified she loves Camille and Owen and has a great relationship with them. She explained the children are covered under her employer's health insurance, and Cole primarily takes care of their medical needs. Katherine stated she has tried to maintain a civil relationship with Devan but feels Devan has not done the same toward her. Katherine testified that when Camille and Owen are with him, he allows them to call Devan whenever they want and never refuses to allow them to talk to Devan if she calls. She explained, however, sometimes the children do not want to talk to Devan when she calls.

Devan testified she lived with Landon, Camille, and Owen. She denied Joshua ever lived with her. She admitted she continued to see Joshua with her children present in spite of a protective order because she did not believe he would hurt them. She also admitted Joshua was arrested at her home on an outstanding arrest warrant early one morning after she called the police because he appeared at her home drunk and became belligerent when she tried to help him to the restroom because he was sick. Devan denied Cole's claims that Landon made the call to the police when Joshua was arrested because the call was made from his phone, explaining she took Landon's

4

phone from him at night so he would not stay awake when he should be sleeping. She also testified Camille and Owen were not home when the police were called to her home. Additionally, Devan acknowledged the police were called to her home on another occasion when her friend called them because Joshua tried to enter Devan's home as her friend was leaving in the early morning hours.

Devan addressed issues that arose with transporting the children to their different schools and maintaining her work schedule. Each child went to a different school, and at one point, Owen went to two schools every day—Mother's Day Out in the morning and the lab school at the University of Louisiana at Lafayette in the afternoon. She explained she left a job that allowed her flexibility to pick up the children as needed because she did not make enough money due to the work she missed transporting the children to different schools. Thereafter, she did not have such flexibility at her new job, which caused her problems attending her appointments with therapists. Devan further explained she had trouble paying the multiple fees associated with the therapy sessions and her car was repossessed. She had to file bankruptcy.

A recorded phone conversation between Devan and Cole shows Cole's attitude toward his relationship with Landon and his resistance to changing his approach to Landon and their relationship. Cole complained Landon stayed in his bedroom while at his home. Devan told him not to let Landon stay alone in his room and avoid him. Cole also complained about Landon's grades, but the call shows he did not believe he should have to check on Landon to make sure his school work was completed or help Landon with his school work or studying for tests. Cole stated at thirteen years old, Landon should be independently responsible for his homework and grades. One of Landon's poor grades was in math, which Landon testified was not his best subject and he needed assistance.

Devan made it clear in that conversation she wanted Landon to have a relationship with Cole. It was evident from the conversation that Cole and Devan have

differing philosophies about how Cole should approach his relationship with Landon. Cole believed he did everything he could to improve his relationship with Landon and make him feel loved, while Devan felt Cole should include Landon more in his life when they were together and work more with Landon on his school work. On one occasion, Devan tried to get online to check Landon's grades but learned her credentials had been changed. She determined Cole's phone number was associated with the changes to her account.

Devan testified she talked to Landon when she found out he was drinking and smoking. Landon told her it only happened on a couple of occasions and he only drank one or two beers. Devan also described difficulties Camille and Owen experienced when preparing to go to Cole's, for example, they became clingy. She believed this was due in part to the fact that they were only allowed minimal contact with her when they are with Cole. She felt three days apart from her was too long for the children at that time.

Dr. Cooper is a registered play therapist. She saw Camille and Owen biweekly to work on emotional regulation strategies and strategies for anxiety and communication. She began seeing the children in November 2021. Dr. Cooper testified that, in December 2022 both children reported Devan's friend, Joshua, comes over with a friend Kerry and indicated they were not supposed to report this because Devan told them it was a secret. Owen also reported at one time Joshua bathed him while Devan was preparing snacks. Dr. Cooper reported that incident to the Department of Families and Children Services as a mandatory reporter but never heard from DCFS about an investigation. She explained she taught the children they each have their own personal bubble and no one should cross that boundary. Dr. Cooper testified the children reported being in the presence of Joshua three other times: March 2023, he went to the Kart Ranch with them; June 2023, he went over at night and played games; and July 19, 2023, he went on a beach trip with them. Dr.

6

Cooper also related an incident that occurred in play therapy when Camille described a bad guy being in their home, hiding behind a sofa. She played out being fearful, the police coming to protect them, and the father figure saving them.

Counsel for Devan pointed out to Dr. Cooper that the hearing officer told Cole in August 2022 he needed evidence of Joshua being present with the children before a hearing scheduled for January 2023. Counsel then asked whether the proximity of those events raised any suspicion that Cole may have told the children to report false claims about Joshua to her in December 2022. Dr. Cooper did not answer the question, explaining she could not due to the nature of her therapy methodology, which allows the children to direct their conversations without her guiding them.

Dr. Cooper testified both parents called her to check on how the therapy was going but stated Cole called more often than Devan, with Cole calling between each session. Dr. Cooper further testified Devan reported that Cole prevented her from communicating with the children when they were with him, as per her instruction. She denied telling either parent they could not talk to the children when they were with the other parent.

Mr. Camos was consulted to assist Landon and Cole in improving their relationship and resume regular visitation with each other. He related Devan allowed Landon to see text messages between her and Cole and said things about Cole that painted him a "negative light," e.g., calling him a narcissist. He also testified Devan reported mental, emotional, and physical abuse by Cole and described her as crying and emotional during one session. Mr. Camos stated that Landon reported he did not like the way Cole treated Devan and that Landon would stand up for his mom. He was concerned about reports by Cole that Devan and her father did not want Landon to see Cole. Mr. Camos also related the conflicting relationship of his parents troubled Landon, and Landon told him he wanted his parents to get along.

7

Landon reported an encounter between Jon and Cole in Mr. Camos' parking lot that involved one of the men yelling at the other after a session. Mr. Camos testified he never clarified whether Cole yelled at Jon or vice versa. Jon admitted, however, he lost his temper and acknowledged he should not have intervened between Landon and Cole. A video from Mr. Camos' security camera shows the two men arguing, then Cole walking off to his truck. Jon followed Cole as he walked to his truck but turned and returned to his truck.

Mr. Camos testified he viewed Cole in a more positive light than Devan and described Cole as a "calm, polite, workable guy." He further testified, however, he believed both Cole and Devan are good hearted and want what is best for Landon. Mr. Camos felt positive about his sessions with Landon.

Connie LeBlanc is a qualified parenting coordinator appointed by the trial court to work with the parents and the children. Due to the incident with Cole and Jon at Mr. Camos' office, she recommended that Jon should not transport Landon to meet Cole. Cole reported he had problems with Devan not having the children ready for school when he picked them up and concerns he had about Landon's absences from school and poor grades. Ms. LeBlanc testified Camille and Owen reported Joshua was at Devan's home with them on some occasions. Camille also reported Devan dressed her in front of Joshua, and Owen reported Joshua urinated outside the home and told him he could do so as well.

Ms. LeBlanc reported Devan did not want to attend the parenting sessions but explained her resistance was primarily financial. Dr. Cooper then refused to work with Cole and Devan because they made agreements but did not follow through as agreed. She also related Cole sent her emails but did not copy Devan. Ultimately, Cole and Devan wanted to wait and let the trial court decide their claims.

Ms. Boudreaux counseled Landon individually. He was almost sixteen years old at the time. Based on Devan's report to her, she described Landon as having a

depressive disorder, which she described as a single episode, unspecified. She did not recommend medication. Landon did not feel he needed therapy and explained he was there to help his family. He reported being absent from school seven to fourteen days, drinking alcohol, and smoking cigarettes. She testified Landon told her he smoked and drank with friends at their homes. He told her Devan did not keep alcohol their home. Landon reported his closest relationships as being with his mother, maternal grandparents, and paternal grandparents.

Ms. Boudreaux testified Landon's family talked about his parents' difficulties in front of him which stressed him. She did not address that with Devan, explaining she does not judge a family's culture and, therefore, did not suggest the family not talk about the parents' relationship in front of Landon. Ms. Boudreaux clarified she did not get the impression the family was "bashing" Cole and believed they just talked about the problems Cole and Devan had with each other. She further testified she was surprised Mr. Camos reported his sessions with Landon went well because Landon reported the opposite.

In a joint session with Landon, Devan stated Cole makes everyone feel inferior and that he is cold and demanding. Cole contacted Ms. Boudreaux about Landon's counseling and explained he was unaware of the counseling. In her opinion, Cole should have been made aware of Landon's counseling with her, but Cole reported Devan did not inform him. Ms. Boudreaux also stated, however, that Cole emailed her a letter but did not copy Devan on the email. She was concerned for Landon because he felt he had to be the bigger person and help to resolve the conflict between his parents. Ms. Boudreaux explained it is not appropriate for a child to feel like he has to resolve his parents' conflicts.

Landon told Ms. Boudreaux he did not want to have a relationship with Cole but also reported his mother and Jon wanted him to have a relationship with Cole. In a joint session with Landon and Jon, Jon reported that he and his wife wanted Landon to

reconcile with Cole and encouraged him to do so. Ms. Boudreaux testified Jon denied stating Landon did not need to have a relationship with Cole if he did not want to reconcile.

Jon testified he sees the children two to three times a week. He denied Cole was his business partner at any time and testified Cole was his employee. Jon acknowledged he had issues with Cole and admitted he acted improperly at Mr. Camos' office when he argued with Cole in Landon's presence. He testified he regretted the incident and that Landon witnessed his behavior. He also described an incident at a soccer game when Cole accused him of striking Cole with a chair. Jon explained the strap on his folding chair was longer than he realized and caught on Cole's toe. Jon denied lying to Landon about Cole and testified how important he feels it is for Landon to have a good relationship with his father. Jon explained he and his father had been at odds for a long time and described their reconciliation as changing his life for the better.

Jon related an incident that occurred when Cole went to pick up Landon at Devan's. Landon had called him for help. Jon described Landon as sounding anxiety ridden, breathing heavily, and crying because his parents were arguing in the front yard. Jon went to de-escalate the situation and believed Cole saw him as a threat. Jon explained he felt Cole needed to leave for Landon to calm down. He admitted talking forcefully to Cole to make him leave but explained no violence occurred. Jon was unaware of Joshua's criminal past and explained he told Devan she should not allow Joshua to be around the children.

Jody testified he believes Cole is a good father but very strict and that Landon is on edge when around Cole. He also testified he had not communicated with Cole in three years due to Cole's refusal to allow him and Kathy to visit the children when they are with Devan or her family. Jody further testified he reached out to Cole during that time, but Cole did not respond. Jody described the children's relationships with

10

Devan, her family, him and Kathy as warm and loving, explaining they got along well and had fun together.

Kathy described Cole's relationship with her as him getting along well with her when it suits him. She testified she raised Cole from the time he was approximately three years old until he moved to live with his maternal grandmother when he was in high school. She described Devan's relationship with the children in her presence as great and loving. She further testified Devan and the children have a loving relationship with Devan's parents. Like Jody, Kathy resented Cole's not wanting her and Jody to see the children except when they are with him.

At the conclusion of the trial, in the presence of the parties, the trial court narrated oral reasons for its ruling on the record. The trial court maintained the parents' joint custody but designated Devan as domiciliary parent and awarded Cole custody every other Thursday and alternating weekends from Thursday to Monday. The trial court signed a judgment in conformity with those reasons on December 13, 2023 and signed a Joint Custody Plan – Domiciliary Parent which sets out the specifics of the plan on December 14, 2023. Due to issues with the record and briefing notices, the appeal is only now ready to be addressed.

## ASSIGNMENTS OF ERROR

(1) The Trial Court erred in ignoring factor (1) of [La.Civ.Code art.] 134, the potential for the children to be abused, which shall be the primary consideration.

(2) The Trial Court erred in reducing Joshua Cole Jagneaux's custodial time with his children.

(3) The Trial Court was clearly wrong in finding that Devan Simpson was the parent most likely to facilitate and encourage a close and continuing relationship between the children and the other parent. [(La.Civ.Code art. (134(12))].

(4) The Trial Court erred in setting no schedule of physical custody for the father with the minor Landon.

11

(5) The Trial Court erred in refusing to provide written reasons for Judgment.

## DISCUSSION

The custody decree at issue herein is a stipulated judgment, not a considered decree. Therefore, Cole has the burden of proving (1) a material change of circumstances has occurred since the stipulated judgment was entered, and (2) his proposed modification is in the best interest of the children. *Hensgens v. Hensgens*, 94-1200 (La.App. 3 Cir. 3/15/95), 653 So.2d 48, *writ denied*, 95-1488 (La. 9/22/95), 660 So.2d 478. Cole is not required to prove under *Bergeron v. Bergeron,* 492 So.2d 1193 (La.1986*),* the continuation of the existing custody arrangement is so detrimental to the children that it justifies modification or that the harm likely to be caused by a change of environment is substantially outweighed by the advantages to the children. *Evans v. Lungrin*, 97-541, 97-577 (La. 2/6/98), 708 So.2d 731.

> The best interest of the child is the sole criterion to be met in making a custody award, as the trial court sits as a sort of fiduciary on behalf of the child and must pursue actively that course of conduct which will be of the greatest benefit to the child. *C.M.J. v. L.M.C.*, 14-1119 (La. 10/15/14), 156 So.3d 16, 28, quoting *Turner v. Turner*, 455 So.2d 1374, 1378 (La.1984). It is the child's emotional, physical, material and social well-being and health that are the court's very purpose in child custody cases; the court must protect the child from the real possibility that the parents are engaged in a bitter, vengeful, and highly emotional conflict. *Id*. The legislature has mandated that the court look only to the child's interests so that the court can fulfill its obligations to the child. *Id*. at 28–29.

*Harvey v. Harper,* 22-744, pp.9-10 (La.App. 3 Cir. 3/1/23), 358 So.3d 988, 996 (quoting *Hodges v. Hodges*, 15-585, pp. 2-3 (La. 11/23/15), 181 So.3d 700, 702).

A trial court's findings of fact in a child custody matter are entitled to great discretion and will not be disturbed on appeal absent an abuse of discretion. *Mulkey v. Mulkey*, 12-2709 (La. 5/7/13), 118 So.3d 357. This is due to the trial court's ability to better assess witness credibility as well as the testimony and evidence presented during a custody hearing in determining the child's best interests. *Rigmaiden v. Dellafosse*, 22-816 (La.App. 3 Cir. 3/29/23), 364 So.3d 472. Additionally, "[e]ach

child custody case must be viewed in light of its own particular set of facts and circumstances with the paramount goal of reaching a decision that is in the best interest of the child." *Bergeron v. Clark*, 02-493, p. 5 (La.App. 3 Cir. 10/16/02), 832 So.2d 327, 330, *writ denied*, 03-134 (La. 1/29/03), 836 So.2d 54. *See also Prather v. McLaughlin*, 16-604 (La.App. 3 Cir. 11/2/16), 207 So.3d 581.

Louisiana Civil Code Article 134 provides a non-exclusive list of criteria to be considered by the trial court in determining the best interest of a child and requires the trial court to consider "all relevant factors in determining the best interest of the child" which "may include" the fourteen factors set forth therein. It is not required that each factor must be reviewed. *See Hughes v. Talton*, 14-17 (La.App. 5 Cir. 10/15/14), 181 So.3d 10. Here, the trial court directly addressed twelve of the fourteen factors enumerated in La.Civ.Code art. 134 and stated the consideration it gave to each of those factors.

### *Potential for the Child to be Abused*

Cole first argues the trial court ignored the primary factor of La.Civ.Code 134(A)(1) in denying his change of custody request. He asserts the trial court committed legal error when applying this factor to the evidence and, therefore, contends the trial court's findings are subject to the de novo standard of review, not the manifest error standard of review.

The first factor in La.Civ.Code art. 134 states: "The potential for the child to be abused, as defined by Children's Code Article 603, which shall be the primary consideration." La.Civ.Code art. 134(A)(1). When assigning its reasons for ruling, the trial court addressed this factor, stating:

> Factor number one is something that Mr. Jagneaux focused on heavily[,] and he said the potential for the child to be abused has to be the trial court's primary consideration. This court has determined that neither parent would abuse or allow the children to be abused. Cole has put much emphasis on the background of [Devan's] former boyfriend Mr. Romero[,] but there was no evidence that Mr. Joshua Romero has done anything to subject the children to harm of [sic] abuse.

13

While the first factor of La.Civ.Code art. 134(A) is designated as the primary factor, it is not the only factor at issue, as all factors relevant to the best interest of the children must be considered and weighed. Accordingly, Cole's argument does not address a legal issue but a factual issue: the trial court's assessment and weighing of evidence regarding the potential for abuse together with the remaining best interest factors set forth in La.Civ.Code art. 134. Accordingly, the manifest error governs our review of the trial court's factual findings and judgment, and the abuse of discretion standard governs our review of the judgment.

Cole argues the testamentary and documentary evidence showing Devan's relationship with Joshua establishes Devan cannot be trusted to safeguard Camille and Owen from potential abuse. He concludes, therefore, the trial court abused its great discretion in reducing his custodial time with the children and naming Devan the domiciliary parent.

We do not agree. We have reviewed the evidence and are concerned Devan failed to be more cautious about Joshua and ignoring court orders. We have also considered the concerns with Devan's failure or perceived refusal to participate in the recommended therapy in light of her employment and the financial burdens associated with her paying for the therapy. In our view, the evidence shows even though Devan failed to abide by a protective order, she is a good mother who has a great relationship with her children and her children love her and are comfortable with her. Further, no evidence shows she has allowed the children to be harmed.

Our review of the evidence also reveals an undercurrent which indicates Cole is a different person in his personal relations with his family members than he is in his relations with others, including the experts involved in this case. This observation is based, in part, on his refusal to agree with Devan to allow the three children to attend the same school, rather than each attend a separate school, to reduce the time she had to miss from work traveling to and from their schools each day. It is also based on his

14

perception that a thirteen-year-old child should be self-sufficient in his academics. We are also concerned with the fact that Cole admitted he lied to Katherine about having a college degree in civil engineering. This lie casts doubt on the validity of many of his claims and also creates uncertainty as to whether he may have coached Camille and Owen to make false reports to Dr. Cooper about Joshua.

### *Reduction of Cole's Custodial Time with the Children*

Cole next asserts the trial court committed legal error in reducing his custodial time with the children because he asked to increase his custodial time with the children from the 3-1-3 time set forth in the stipulated judgment and Devan did not request a change in the time children the children were in her custody.

The trial court determined Cole had proved a change of custody was warranted, explaining, in part: "[T]he current custodial plan is not working, and the parents have been unable to function under their current plan. There's been constant litigation[,] so I do find a change in circumstances to modify the prior award." The trial court cited *Hughes*, 181 So.3d 10, in support of this determination. *Hughes* held where there is "significant and continuing difficulty working together" grounds exist to modify the physical custody schedule. *Id*. at 16, The trial court proceeded with its analysis of the La.Civ.Code art. 134 best-interest factors before changing the custody schedule to award Devan domiciliary status of the children and reducing Cole's custodial time with them.

Devan cites *Gerhardt v. Gerhardt*, 46,463 (La.App. 2 Cir. 5/18/11), 70 So.3d 863, as support for the trial court's change in the physical custody schedule in her favor when she did not ask for custody in a pleading and actually testified she was satisfied with the 3-1-3 custody schedule. In *Gerhardt*, a similar situation arose. The father requested a modification to his visitation schedule; he did not request sole custody. The mother filed an opposition praying for sole custody. The trial court awarded sole custody to the father. On appeal, the mother argued the trial court

exceeded its authority in going beyond the pleadings. The second circuit affirmed the modification, finding the trial court's reasons for ruling showed the trial court examined the evidence presented by the parties and ruled outside the pleadings based on the evidence. The court pointed out that while the father did not pray for sole custody, the mother did. As a result, she was on notice that custody was an issue before the court. The court also determined the trial court's ruling was supported by the record and within the dictates of La.Code Civ.P. art. 862, which provides, in pertinent part, "a final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings and the latter contain no prayer for general and equitable relief."

Cole submitted the issue of custody to the trial court. Accordingly, the trial court did not commit legal error in going outside the pleadings to amend the custodial time Cole and Devan have with the children.

### *Facilitating and Encouraging a Close, Continuing Relationship between the Children and the Other Parent*

Cole next urges the trial court was clearly wrong in finding Devan is more likely to facilitate a close and continuing relationship between him and the children than vice versa as provided in La.Civ.Code art. 134(12). He argues the evidence shows that Devan and her family did not want the children to have a relationship with him, pointing out he had not had visitation with Landon for over two years and Devan had discussed the litigation with Landon and admitted to calling Cole a narcissist. He also noted Landon referenced Cole as a narcissist to Mr. Camos and Mr. Camos' testimony that Landon was told things "that painted [Cole] in a negative light."

The trial court addressed this factor stating:

The factor that is the deciding factor for the court is the willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party. This was the most concerning and the one that I focused most of my reasoning on. I was very disappointed that Mr. Jagneaux had nothing positive to say about Ms. Simpson, or any of his family, or her family. Even after I stated that

16

in court and when his lawyer asked him about the concerns that I voiced he had nothing positive to say. He said one sentence "She's not a bad person or a bad mother," that's it. That's the only positive thing I heard in the whole trial. I believe Mr. Jagneaux has demonstrated that he cannot facilitate a relationship with the children and their mother because of the disdain he has shown towards her in court and this has to bleed over in to his interactions with Devon, in front of the children and the children certainly know how their father feels towards their mother. Devon testified she had gone days without talking to the kids, that when the children are at her house she's made every attempt to try to encourage them to talk to their father. I was concerned that Mr. Jagneaux cut ties with his father and stepmother because he asked them to cut ties with Devon and her family. He hasn't had contact with his father Mr. Jagneaux in two years. It all started because he asked that his father and stepmother only see their grandkids through him. And I find it hard to follow that logic[,] and I think his father and stepmother chose the grandkids. You know, Devon acknowledges that Cole is a good father. I really didn't hear anything that she had to say about him that was negative. She's tried to encourage Landon to reconcile with his father. She's encouraged the younger children to call their father when they've been at her house. You know, Mr. Jagneaux by contrast I don't believe has encouraged the two younger children to interact with the mother on his time. He doesn't even want the children to approach their mother at public extracurricular activities when the children are in his custody. Mr. Jagneaux has even asked that her time with the children be reduced to an alternating weekend visitation. Ms. Simpson's father testified. He also testified that he encouraged Landon to have a relationship with his father Mr. Jagneaux and used his own life and relationship with his own father as an example to encourage . . . Landon to repair the relationship with his father.

The record shows Cole and Devan have had continuing difficulties working together, which have affected the children and their relationships with their parents. Cole argues the trial court erred in not accepting the expert's testimony that he was more cooperative than Devan. This argument fails in light of the evidence cited by the trial court and the evidence establishing he lied about having a college degree in civil engineering. The trial court's findings and rulings are based on its assessment of the credibility of the witnesses and supported by the evidence.

### *Physical Custody of Landon*

Cole assigned error with the trial court's failure to schedule custodial time for him with Landon. On appeal, he acknowledged that any issue regarding custody and/or visitation with Landon is moot because Landon turned eighteen years of age in December 2024.

***Did the Trial Court Err in Refusing to Issue Written Reasons?***

Cole filed a motion to have the trial court issue written reasons for judgment as provided in La.Code Civ.P. art. 1917(A), which requires the trial judge to provide written "findings of fact and reasons for judgment." The trial court denied the motion and issued a written denial of Cole's request, citing *Mack v. City of Baton Rouge*, 06-140 (La.App. 1 Cir. 4/4/07), 960 So.2d 1008, *writ denied,* 07-959 (La. 6/22/07), 959 So.2d 508, as the basis for its denial. In *Mack*, the trial court gave oral reasons for ruling and had those reasons transcribed and filed into the record before the appellant filed his notice of appeal. The first circuit denied the appellant's motion to remand the matter to the trial court for it to issue written findings of fact and reasons for judgment because the appellant "had an opportunity to review the written reasons prior to perfecting the appeal." *Id*. at 1010. Herein, the trial court did the same. Accordingly, this assignment lacks merit.

## DISPOSITION

For these reasons, the trial court's judgment maintaining the parties' joint custody of the children, naming Devan Simpson as the domiciliary parent, and reducing Joshua Cole Jagneaux's custodial time with the children as set forth in the Joint Custody Plan-With Domiciliary Parent. All costs are assessed to Joshua Cole Jagneaux.

**AFFIRMED.**